IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTONIO SANTIAGO | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 11-7269 |
| BROOKS RANGE CONTRACT | : | |
| SERVICES, INC. | : | |

**SURRICK, J.**                                      **SEPTEMBER  30  , 2014**

<u>**MEMORANDUM**</u>

Presently before the Court is Defendant Brooks Range Contract Services, Inc.'s Motion for Summary Judgment.  (ECF No. 30.)  For the following reasons, Defendant's Motion will be granted.

**I.      BACKGROUND**

**A.      Procedural History**

On or about March 25, 2010, Plaintiff filed a written charge of discrimination against Defendant with the Philadelphia office of the Equal Employment Opportunity Commission ("EEOC"), alleging age and race discrimination.  (Compl. ¶ 13a, ECF No. 1.)  Plaintiff was 73 years old at the time he filed the EEOC Charge of Discrimination.  (*Id.* ¶ 17.)  On August 22, 2011, the EEOC issued a Notice of Right to Sue.  (*Id.* ¶ 13b.)

Plaintiff filed his Complaint on November 21, 2011, which was within ninety days of his receipt of the Notice of Right to Sue.  (*Id.* at ¶ 13c.)  Plaintiff asserted the following claims: (1) discrimination on the basis of age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA") (Count I); (2) discrimination on the basis of race, in violation of  Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII")

(Count II); and (3) age and race discrimination, in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.* ("PHRA") (Count III).

On March 26, 2012, we entered an Order and accompanying Memorandum granting Defendant's Motion to Dismiss, and permitting Plaintiff to file an amended complaint. (ECF Nos. 13, 14)  Plaintiff filed the Amended Complaint on April 23, 2012.  (Am. Compl., ECF No. 15.)[1]  Defendant filed an Answer to the Amended Complaint on May 7, 2012.  (ECF No. 18.) On September 28, 2012, Defendant filed the instant Motion for Summary Judgment.  (Def.'s Mot., ECF No. 30.)  Plaintiff filed his Memorandum of Law in Opposition to the Motion on October 15, 2012.  (Pl.s' Resp., ECF No. 32.)

### B.    Factual Background

Defendant Brooks Range Contract Services, Inc. ("BRCS") is a federal government contractor engaged exclusively in the business of providing services to federal government agencies.  (Am. Compl. ¶ 3.)  Plaintiff Antonio Santiago is a Hispanic male.  (*Id.* ¶ 16.)  From 1975 until 2010, Plaintiff worked as an Environmental Control Center ("ECC") Operator at the Social Security Administration ("SSA") building in Philadelphia, Pennsylvania. (Santiago Dep. 15-16, 29, Pl.'s Resp. Ex. A.)[2]  During his time at the SSA building, Plaintiff was employed by the contractor U.S. Facilities, Inc. ("U.S. Facilities") from March 1, 1985 until January 22, 2010, when Plaintiff was informed that he, as well as other U.S. Facilities employees, was required to

---

[1] Plaintiff asserts the same three claims in his Amended Complaint as he did in the original Complaint.

[2] As part of his duties as an ECC operator Plaintiff worked in the "ECC room" monitoring the operations of the building equipment.  (Santiago Dep. 23-25; Jones Dep. 10, Def.'s Mot. Ex. F.)  Plaintiff also mentioned that he was employed as an Operating Engineer (Santiago Dep. 20-23), but based on his deposition testimony, it appears that he performed the duties of an operating engineer from time to time when needed, but never officially had the title. Zach Jones, Plaintiff's direct supervisor, testified that Plaintiff's title was ECC Operator, and that Plaintiff never performed the duties of an Operating Engineer.  (Jones Dep. 10.)

put his identification badge in an envelope and turn it in to security.  (Santiago Dep. 12, 46.)

Plaintiff was advised that employees would be notified that weekend whether they would be

hired by Defendant.  (*Id*. at 41.)  Defendant took over the U.S. Facilities contract on February 1,

2010.  (*Id*. at 41).

       Plaintiff completed and submitted an application for employment with Defendant.  (*Id*. at

78.)[3]  Plaintiff later learned from his former supervisor, Brian Gougler that he was not hired by

Defendant due to "poor performance."  (Santiago Dep. 48.)[4]

### A.      Defendant's Decision Not to Hire Plaintiff

       Howard Anastasi, Vice President of Humans Resources for BRCS, made the hiring

decisions after BRCS took over the US Facilities contract.  (Anastasi Dep. 9-11, Pl.'s Resp. Ex.

B.)  As a part of the hiring process, Anastasi conducted interviews in January 2010 with the

employees of U.S. Facilities.  (*Id*. at 22, 24.)[5]  Anastasi did not interview Plaintiff, because he

claims, that Plaintiff "never appeared for his interview."  (Anastasi Dep. 23.)[6]  There were no

scheduled interviews; rather, it was "open scheduling." (Anastasi Dep. 23.)  Anastasi testified

that he had "several standing room only introductory talks with the incumbent staff" regarding

---

[3] Plaintiff does not remember who he submitted the application to, nor does the record show when he submitted the application. (Santiago Dep. 78.)  The application was introduced as Exhibit 3 during Plaintiff's deposition, but was not filed as part of the record on summary judgment. (*See* Santiago Dep. 78.)  Anastasi testified that he never had Defendant's application in his possession. (Anastasi Dep. 23, 29.)

[4] Brian Gougler was employed as a Project Manager by U.S. Facilities and was subsequently hired in that same role by Defendant.  (Gougler Dep. 13, Pl.'s Resp. Ex. G.) Gougler testified that he did not inform Plaintiff that he would not be hired.  (*Id*. at 91.)

[5] Zach Jones testified that the interviews with Anastasi were conducted in September of 2009.  (Jones Dep. 37.)

[6] Plaintiff testified that after he submitted his completed application he did not interview for the position.  (Santiago Dep. 78. ("I bring [the application] over and I didn't hear anything from them.").)

the interview process and that applications were distributed at these meetings.  (*Id.* at 24, 28.)

He testified that he posted signs throughout the SSA building advising employees about the open

interviews and about the "introductory talks."  (*Id*. at 26.)  All applications were to be submitted

directly to Anastasi.  (*Id.* at 28-29.)

In addition to the interviews, Anastasi requested input from Gougler and Francis Casey[7]

regarding the incumbent staff.  (Anastasi Dep. 31, 46, 54-55; Gougler Dep. 63.)  Anastasi

testified that Gougler said that there had been some problems with Plaintiff in the past.  (Anastasi

Dep. 37-38, 42-43.)  Gougler also testified that in his opinion Plaintiff had "issues [and ] flaws."

(Gougler Dep. 67.)  One such issue that Gougler discussed was Plaintiff's failure to understand

the fire system and fire alarms, and his failure to "write out the appropriate input after a fire

alarm."  (Gougler Dep. 28, 68.)[8]  Gougler also heard from multiple sources that Zach Jones,

Plaintiff's direct supervisor,[9] assisted Plaintiff with his duties on multiple occasions because

Plaintiff was unable to adequately perform his tasks.  (Gougler Dep. 68-71.)[10]

Casey also told Anastasi that there had been problems with Plaintiff's performance.

(Anastasi Dep. 44-45.)  Specifically, Casey told Anastasi that Plaintiff struggled to learn the

computer systems, and that Plaintiff had been discovered sleeping while at work.  (*Id*. at 44-45,

---

[7] Mr. Casey was an Operating Engineer with U.S. Facilities for 18 years prior to BRCS taking over the contract.  (Pl.s' Resp., Ex. F Casey Dep. 6-7.)  He was promoted to Assistant Project Manager by BRCS.  (*Id*. at 6-7.)

[8] Plaintiff denies that he ever committed any errors with respect to the fire alarm system. (Santiago Dep. 54.)  Jones also denies that Plaintiff ever failed to complete the proper documentation after a fire alarm. (Jones Dep. 19-20.)

[9] Zach Jones was Plaintiff's direct supervisor at U.S. Facilities from 1986 until 2010. (Santiago Dep. 39 & Jones Dep. 9.)

[10] Jones testified that he never had any performance issues with Plaintiff. (Jones Dep. 12-14.)

4

55.)[11]  Anastasi testified that Casey "had serious concerns about Mr. Santiago's performance in

that role."  (Anastasi Dep. 55.)  When asked specifically about those concerns Casey stated the

following:

> [H]e did not know all the systems that we had in the building.  I had to come
> down and make changes for him on a daily basis.  I had to get a computer to put
> up in the penthouse because he wasn't doing his job and I had to do the job from
> the penthouse.[12]  So we had to run a whole new computer line up to the penthouse
> so we'd be able to run the building.  There was too many mistakes and he didn't
> understand the systems.  When the systems went in, he never was able to adjust
> and pick up the systems.  It was a complicated system and it was a lot of different
> systems; ice system, fire system and so forth.  He didn't understand it.

(Casey Dep. 26.)  Casey testified that he along with the other engineers, Mike Reilly, Zach

Jones, and Richard Finocchio, had to assist Plaintiff with the fire alarm systems.  (*Id*. at 47-48.)[13]

Casey argued with Plaintiff about Plaintiff's inability to master the systems, and about how to

respond to service calls.  (Casey Dep. 35.)  Casey had job-related disagreements with other co-

workers as well, but he explained that he "did not have to go back every day or every two days

and go over the same exact problems with them as I had to with [Plaintiff]."  (*Id.* at 47.)

According to Casey, Plaintiff's job performance issues started when the new systems were

installed fifteen years ago.  (*Id.* at 31.)  Casey verbally complained to Gougler, and to Gougler's

supervisors about Plaintiff's performance issues, but never put any of these complaints in

writing.  (*Id*. at 27-28.)

Anastasi testified that he made his hiring decisions based in large part on the interviews

(Anastasi Dep. 22), and that Casey's opinion regarding Plaintiff had a minimal role in his

---

[11] Plaintiff denies that he fell asleep while at work.  (Santiago Dep. 53-54.)  Jones also
testified that he never had a problem with Plaintiff sleeping while at work.  (Jones Dep. 19.)

[12] The "penthouse" is not defined or explained anywhere in the record.

[13] Plaintiff denies that he ever committed errors with respect to the fire alarm system.
(Santiago Dep. 54.)

decision.[14]  (Anastasi Dep. 44.)  Anastasi stated that an event that he witnessed at the SSA building at some point prior to the end of January 2010 influenced his decision not to hire Plaintiff.  (*Id.* at 43.)  While Anastasi was at the building for a meeting, Plaintiff allegedly made errors with the computer operating system, which "set off a chain of events which was described by a number of people running around at the time as an emergency" and "it created quite a stir which left [Anastasi] in the lurch for two to three hours."  (*Id*. at 40.)  According to Anastasi, the incident "generated a great deal of concern," and his then-prospective client, the Social Security Administration, was very upset.  (*Id*. at 43-44.)  Anastasi did not know exactly what mistake was made, but claims the incident was due to Plaintiff "overlooking alarms in the ECC" room.  (*Id.* at 39.)  No one told Anastasi that Plaintiff had made a mistake, but Anastasi overheard a number of people say that the incident was due to an oversight on the part of Plaintiff.  (*Id*. at 40.)  This "emergency" influenced Anastasi's decision not to hire Plaintiff.  (*Id*. at 43.)

Ultimately, Defendant was not able to hire all of U.S. Facilities engineering employees due to cost constraints, and Plaintiff was not chosen because "the SSA building manager, Rich Finocchio, informed Mr. Anastasi that they had previously observed [Plaintiff] on more than one occasion asleep while on duty and that he had not mastered the fire alarm system, which required frequent assistance from other personnel to correct his errors."  (Def.'s Mot. 13; Def.'s Answer to Interrrog. No. 11, Def.'s Mot. Ex. B.)

Contrary to both Gougler's and Casey's testimony, Zach Jones testified that he never had any issues with Plaintiff's job performance.  (Jones Dep. 12.)  Jones characterized Plaintiff as "somewhere between [a] good and model employee.  He was resourceful."  (*Id.* at 13.)

---

[14] Anastasi testified that Casey's input did "not really" have an impact on his decision not to hire Plaintiff, and that if anything, it only solidified his decision "a little bit."  (Anastasi Dep. 44, 45.)  Anastasi also testified that Gougler's comments about Plaintifff's job performance issues did not affect his hiring decision, because he had already made his decision not to hire Plaintiff based on other concerns. (*Id.* at 31, 43.)

According to Jones, "[Plaintiff] was very competent in his position . . . not just from his years on the job but from his ability to deal with the clients and rectify issues." (*Id.* at 14.)  Jones stated that Plaintiff was reliable, and that he could "count on him coming to work and always being on time." (*Id.* at 15.)  Jones testified that he never had problems with Plaintiff sleeping while at work, or failing to complete the proper documentation after a fire alarm. (*Id.* at 19-22.)

### B.   Plaintiff's Replacement

Plaintiff asserts that he was replaced by Joe Dingler, a Caucasian, 45-year-old male. (Pl.'s Mot. 8; Santiago Dep. 33-34, 54 -55, 60.)  Soon after discovering that he would not be hired by Defendant, Plaintiff called the ECC room to see who had taken over his position. (Santiago Dep. at 55-56.)  Dingler answered the phone, and when asked by Plaintiff if he was "covering his position," Dingler responded yes. (*Id.* at 57.)[15]  Jones, Gougler, and Casey also testified that Dingler replaced Plaintiff as an EEC Operator for a period of time. (Jones Dep. 61, Gougler Dep. 92; Casey Dep. 60.)

Plaintiff testified that Richard Newton (Caucasian, age 56) was hired by Defendant as an EEC Operator and subsequently replaced Dingler. (Santiago Dep. 60; Def.'s Mot. 13 n.2.) However, Defendant contends that Newton was not hired at the time that Defendant took over the contract because Newton failed a drug screening. (Def.s' Mot. 4; Anastasi Dep. 58, 60; Gougler Dep. 100.)  Defendant does admit that Newton was hired on March 29, 2010, as a full-time ECC Operator. (Def.s' Mot. 13 n.2.)  Newton passed away in November of 2010 (Pl.'s Resp. 8 n.3) and Orlando Rivera[16] replaced Newton as a full-time ECC operator (Santiago Dep. 62; Gougler Dep. 54-56; Casey Dep. 29-30).

---

[15]  Plaintiff also stated that he did not know if Dingler replaced him. (*Id.* at 57-58.)

[16] Plaintiff testified that Rivera is Hispanic. (Santiago Dep. 62.)

7

Defendant claims that no one replaced Plaintiff, rather Defendant hired less employees when it took over the contract from U.S. Facilities.  (Def.'s Mot. 17.)  Anastasi testified that pursuant to Defendant's bid for the SSA building contract, Defendant hired fewer employees than U.S. Facilities.  (Anastasi Dep. 16, 18, 21, 46.)  Gougler also testified that Plaintiff was not hired due to budget constraints.  (Gougler Dep. 81-82.) When Defendant's contract went into effect on February 1, 2010 the following ten individuals were hired: [17]

Full-Time ECC Operators:

    (1) Perry Crawford (African-American, age 33)

    (2) Mike Ernst (Caucasian, age 59)

    (3) Geroge Smith (African-American, age 58)

    (4) Joe Dingler (Caucasian, age 5)

Part-Time ECC Operators:

    (1) Kevin Sannuti, Jr. (African-American, age 25)

    (2) Angel Santiago (Hispanic, age 79)

Operating Engineers:

    (1) Mike Reilly (Caucasian, age 53)

    (2) Orlando Rivera (Hispanic, age 51)

    (3) John Figgins (Caucasian, age 45)

Electrician:

    (1) Kevin Sannuti (African-American, age 47)

---

[17] Defendant claims that prior to taking over the contract, U.S. Facilities had employed 12 engineering employees, including Plaintiff.  (Def.'s Mot. 11-12.)

(Def.'s Mot. 12-13.)[18]

### C.   Casey's Allegedly Discriminatory Remarks

Zach Jones testified that he had heard Fran Casey make derogatory remarks and jokes about certain ethnicities, specifically "Spanish" and "orientals." (Jones Dep. 27, 53.) Jones stated that he could not specifically remember the jokes, but that they were typically about Spanish accents. (*Id.* at 53.) On more than one occasion Jones heard Casey refer to "people of a Spanish background" as "spics." (*Id.* at 27, 56.) Jones testified that these alleged discriminatory remarks were not directed towards Plaintiff. (*Id.* at 50-51.)[19]

Jones also testified that he had minor disagreements with Casey about the employees Jones selected for hire. (Jones Dep. 24-25.) In general, Jones believed that Casey was opposed to hiring Hispanic people. Specifically, Casey disagreed with Jones' decision to hire Orlando Rivera as an ECC operator. (Jones Dep. 25-26.) When asked to elaborate about this particular disagreement, Jones testified as follows:

> A:   "Well, I brought in [Orlando Rivera] who had worked his way up from being a security guard to an engineer and included him on the staff, and [Casey] had strong objection to bringing in a Spanish person, which, you know, I said we don't have a policy of only hiring your friends, we hire whoever is qualified.
>
> Q:   What did Fran Casey say that led you to believe he objected to the fact that this person you hired was a Spanish person?
> A:   Well, their look, their name and, you know, he asked why didn't I hire another person which was someone he was affiliated with. I basically had a non-discriminatory policy.
>
> Q:   I'm not sure you understood my question. Why did you think that Fran Casey did not like the fact that that person was Spanish?

---

[18] Plaintiff admits part of this averment, but denies that Richard Newton was not hired by Defendant. (Pl.'s Mot. 15.) Defendant denies hiring Newton when it initially took over the contract, but later admits that Newton was later hired on March 29, 2010, as a full-time ECC Operator. (Def.s' Mot. 13 n.2.)

[19] Anastasi testified that he never heard Casey refer to Hispanic individuals in a negative way. (Anastasi Dep. 60-61.)

A:      He informed me of his displeasure with my choice.

Q:      Okay.  Do you recall what he said?

A:      Not exactly.

(Jones Dep. 25, 26.)

Q:      Can you remember how he would express his displeasure at you hiring or consideration a Hispanic employee?

A:      Yeah, he asked me why did I hire that guy. I said it was my choice.

Q:      Would he say that guy or would he use the term spic or something else?

A:      Generally, he would say that guy.

Q:      Did you notice whether or not he treated white employees or workers differently than people who are black, Hispanic?

A:      He didn't really have a problem with black people, but he did more or less look down on the Spanish.

Q:      And can you tell me why you conclude that?

A:      I think, you know, like a lot of American, and unfortunately, I don't want to generalize, kind of make fun of people if they don't speak good English and they have an accent.

Q:      Did you ever observe Mr. Casey exhibiting that sort of behavior?

A:      Yes.

(*Id*. at 29-30.)

Q:      Mr. Casey didn't tell you that he preferred to hire a Caucasian over a Hispanic person, did he?

A:      He gave me a resume of someone who was either closely affiliated or related to him prior to any of this hiring taking place, and I made my decision based on, you know, what I see and what I felt, and I felt that bringing in someone that, A, I didn't know whose qualifications may or may not have fit the bill when I already have someone who did I know whose qualification did fit was more applicable in the fact that, you know, he would come to me and say why did you hire the Spanish guy. . . .

10

Q:     I don't think you understood the exact question that I asked. (court reporter read back the last question)

A:     And as I said Mr. Casey had a preference for me to hire someone who was, like I said, either he was friendly with or related to, and because I didn't, he was a little displeased.

(*Id*. at 51-52.)

Q:     And you testified that Mr. Casey looked down on Spanish people, what do you mean by that?

A:     Sometimes he would diminish their ability to do the same job as him.

Q:     Did he ever tell you he looked down on Spanish people?

A:     If you tell me that, you know, this guy shouldn't have that job, I think that's telling me that you look down on them.

(*Id*. at 57-58.)

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a) summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party has the initial burden of showing that no genuine issue of material fact exists.  *Adderly v. Ferrier*, 419 F. App'x 135, 136 (3d Cir. 2011) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  If the movant carries his burden, the nonmoving party must "set forth specific facts demonstrating a genuine issue for trial."  *Id*; *see also Celotex*, 477 U.S. 317 at 324 ("[T]he nonmoving party [must] [] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.'"); *Fireman's Ins. Co. of Newark, N. J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (nonmovant cannot "rely merely upon bare assertions, conclusory allegations or suspicions").

11

In determining if a factual dispute is genuine the court must consider whether "the [record] evidence [taken as a whole] is such that a reasonable jury could return a verdict for the nonmoving party . . . .  The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141, n.4 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A disputed fact is material if it would affect the outcome of the suit as determined by the substantive law." *J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 925 (3d Cir. 2011) (quoting *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992)).  The court must view facts and inferences in the light most favorable to the nonmoving party.  *Id.*  We cannot resolve factual disputes or make credibility determinations.  *Siegel Transfer v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## III.   DISCUSSION

### A.   Age Discrimination Under the ADEA and the PHRA[20]

#### 1.   Legal Standard

The ADEA provides in relevant part that "[i]t shall be unlawful for an employer [] to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

---

[20] The parties agree that Plaintiff's PHRA claims are analyzed under the same framework as the ADEA and Title VII claims.  (Pl.'s Resp. 4; Def.'s Mot. 8.)  Therefore, we will analyze Plaintiff's causes of actions by type of claim:  age discrimination and race discrimination.  *See Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) ("'The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania Courts have construed the protections of the two acts interchangeably.'") (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001)); *Cobetto v. Wyeth Pharm.*, 619 F.Supp.2d 142, 152 (W.D. Pa. 2007) ("[T]he Pennsylvania courts interpret the PHRA in accordance with Title VII and the ADEA.") (citing *Kelly v Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

individual's age."  29 U.S.C. § 623(a)(1).  Plaintiff contends that he may avoid summary

judgment on his ADEA claim under the burden shifting paradigm established in *McDonnell

Douglas Corp. v. Green*, 411 U.S. 792 (1973) or the mixed-motive analysis.  (Pls.' Mem. 6, 13.)

    The mixed-motive analysis enunciated by the United States Supreme Court in *Price

Waterhouse v. Hopkins*, 490 U.S. 228 (1989), and codified by Congress the Civil Rights Act of

1991, 42 U.S.C. § 2000e-2(m), states that "an unlawful employment practice is established when

the complaining party demonstrates that race, color, religion, sex, or national origin was a

motivating factor for any employment practice, even though other factors also motivated the

practice."  42 U.S.C. § 2000e-2(m).  The "mixed-motive" framework does not apply to claims

brought under the ADEA.  *Gross v. FBL Financial Services*, 557 U.S. 167, 175 (2009); *Smith v.

City of Allentown*, 589 F.3d 684, 690 (3d Cir. 2009) ("*Gross* refused to apply *Price Waterhouse* to

ADEA claims . . . ."); *Kelly v. Moser, Patterson & Sheridan, LLP*, 348 F. App'x 746, 750 (3d Cir.

2009) ("[*Price Waterhouse*] does not apply to cases under the ADEA.").  The Court held that to

prevail under the ADEA the plaintiff must prove "that age was the 'but-for' cause of the

employer's adverse action."  *Id.* at 2351.  Following the Court's decision in *Gross*, the Third

Circuit held that notwithstanding this but-for causation standard, the *McDonnell Douglas* standard

continues to apply to claims brought under the ADEA.  *Smith*, 589 F.3d at 691 ("[W]e conclude

that the but-for causation standard required by *Gross* does not conflict with our continued

application of the *McDonnell Douglas* paradigm in age discrimination cases.").  Therefore, we

evaluate Plaintiff's age discrimination claim under the *McDonnell Douglas* burden-shifting

framework.

    In order to establish a *prima facie* case of age discrimination under *McDonnell Douglas*

the plaintiff must prove:  (1) that he is forty years of age or older; (2) that he was subjected to an

adverse employment action by the defendant; (3) that he was qualified for the job; and (4) that

that he was replaced by a sufficiently younger employee to support an inference of age

discrimination.  *Smith*, 589 F.3d at 689-90 (citing *Potence v. Hazleton Area Sch. Dist*., 357 F.3d

366, 370 (3d Cir. 2004)).[21]  If the plaintiff establishes a *prima facie* case, the burden of production

shifts to the defendant to articulate a "legitimate non-discriminatory reason for the adverse

employment action."  *Id.* at 690.  The employer can satisfy its burden "by introducing evidence

which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for

the unfavorable employment decision."  *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  The

defendant need not prove that the articulated reason actually motivated the adverse employment

action.  *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Once the

employer satisfies its burden, the burden of production returns to the plaintiff, who then must

demonstrate, by a preponderance of the evidence, that the employer's proffered reason is pretext

for discrimination.  *Id.*

 The plaintiff can establish pretext by "(1) discrediting the proffered reasons for the

adverse employment action, either circumstantially or directly, or (2) adducing evidence, whether

circumstantial or direct, that age discrimination was more likely than not the 'but for' cause of

---

[21] Plaintiff argues that the instant case is comparable to a reduction in force ("RIF"), or outsourcing, and as such this Court should apply a "relaxed" standard to Plaintiff's fourth element of his *prima facie* case.  (Pl.'s Mot. 5-6.)  The Third Circuit in *Showalter v. University of Pittsburgh Medical Center* held that in the context of a RIF, in order to satisfy the fourth element of the prima *facie case* under the ADEA, the plaintiff must show that the employer *retained* sufficiently younger employees.  190 F. 3d 231, 235-36 (3d Cir. 1999).  However, an employee is not terminated as part of a RIF if he "is replaced after his [] discharge, and an employee is replaced only when another employee is hired or reassigned to perform the terminated employee's duties."  *Michniewicz v. Metasource, LLC*, 756 F. Supp. 2d 657, 666 (E.D. Pa. 2010) (citing *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990)).  Even though Plaintiff argues this case is analogous to a RIF, he concurrently argues that Joe Dingler replaced him as a full-time ECC operator.  (Pl.'s Mot. 8; Santiago Dep. 33-34, 54-55, 60.)  Since Plaintiff contends that Dingler was hired as Plaintiff's replacement, we will not apply the RIF standard set forth in *Showalter*. *See infra* Section III.A.2.

[the adverse employment action]." *DeAngelo v. DentalEZ, Inc.*, 738 F. Supp. 2d 572, 580 (E.D. Pa. 2010) (citing *Taby v. Fireman's Fund Ins. Co*., No. 08-2746, 2009 WL 3152182, at *7 (E.D. Pa. Sept. 30, 2009)).  To discredit the employer's stated reasons, the plaintiff can show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (citing *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).  "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Id.*  Proof that age discrimination was a determinative but-for factor can include evidence that the "employer treated similarly situated individuals who were not members of the protected class more favorably." *Santichen v. Greater Johnstown Water Auth*., No. 06-72, 2008 WL 868212, *14 (W.D. Pa. Mar. 31, 2008) (internal quotation marks omitted).  The burden of persuasion rests at all times with the plaintiff. *Smith*, 589 F.3d at 690.

### 2.     *Prima Facie Case*

Plaintiff has established a *prima facie* case of age discrimination.  An individual must be greater than forty years of age to be eligible for the ADEA's protections.  29 U.S.C. § 631(a).  Plaintiff was seventy-three years old at the time he filed his Charge of Discrimination with the EEOC.  (Am. Compl. ¶ 17.)  Plaintiff was qualified for the job, but suffered an adverse employment action when he was not selected for hire by Defendant.[22]  Finally, Plaintiff was

---

[22] According to Plaintiff, he completed and submitted an application for a position with Defendant, but was never interviewed.  Defendant does not argue in its Motion that Plaintiff failed to apply for a position.  It is clear from the record that Plaintiff was considered for a position by Defendant.  The dispute over whether Plaintiff filed an application is immaterial.

replaced by a sufficiently younger employee, Joe Dingler, age 45.  (Jones Dep. 61; Gougler Dep. 92; Casey Dep. 60.)

Plaintiff argues that Dingler replaced Plaintiff.  (Pl.'s Resp. 8.)[23]  The record indicates that Dingler did replace Plaintiff as an ECC operator.  Jones, Gougler, and Casey all testified that Joe Dingler took over Plaintiff's shift.  (Jones Dep. 61; Gougler Dep. 92; Casey Dep. 60.)  In addition, Plaintiff was told by Dingler that he had taken over Plaintiff's shift.  (Santiago Dep. 57.)  Dingler, age 45, was over 20 years younger than Plaintiff at the time that Plaintiff was not selected for hire.  An age difference of more than 20 years is sufficient to satisfy the fourth element of Plaintiff's *prima facie* case.  *See Maxfield v. Sinclar Int'l*, 766 F.2d 788, 793 (3d Cir 1985) (replacement by an employee more than 20 years younger was sufficient to satisfy *prima facie* case).

### 3.    *Legitimate, Non-Discriminatory Reasons Defendant Did Not Hire Plaintiff*

Defendant contends that it was unable to hire all of U.S. Facilities engineering employees due to costs of the contract, and Plaintiff was not selected for hire because the SSA Building Manager, Rich Finocchio, informed Anastasi that he had observed Plaintiff asleep on more than one occasion while on duty, and that he had not mastered the alarm system.  (Def.'s Mot. 11-14; Def.'s Answer to Interrog. No. 6.)  Anastasi testified that he witnessed an "emergency" situation allegedly caused by a mistake made by Plaintiff, and that this influenced his decision not to hire Plaintiff.  (Def.'s Mot. 14; Def.'s Answer to Interrog. No. 11; Anastasi Dep. 40-44.)  Defendant has met its burden of providing a legitimate, non-discriminatory reason for the adverse employment action.

---

[23] Plaintiff also testified that Newton, and then Rivera replaced Dingler.  (Santiago Dep. 60, 62.)

4.    *Evidence of Pretext*

As previously noted, to defeat a motion for summary judgment, Plaintiff must either discredit Defendant's articulated reasons, or adduce evidence that age discrimination was more likely than not the 'but for' cause of the adverse employment action.  Plaintiff attempts to discredit Defendant's proffered reason by citing the following evidence:  Plaintiff was replaced by a younger employee; Defendant favored younger employees; and the inconsistencies in Defendant's articulated reasons.  (Pl.'s Mot. 8-13.)

Plaintiff contends that being replaced by Joe Dingler, a younger, less-experienced employee, is evidence of pretext.  (Pl.s' Mot. 8.)  Plaintiff concludes, without offering any support, that Dingler is less-experienced.  However, merely hiring someone with less experience does not show discriminatory animus, nor is it strong evidence of pretext.  *See Robinson v. Matthews Int'l Copr.*, 368 F. App'x 301, 305-06 (3d Cir. 2010) ("[S]imply because [the plaintiff] thinks he is more qualified . . . does not entitle him to the position nor show discriminatory animus on the part of [the defendant].); *Glover-Daniels v. 1526 Lombard Street SNF Ops. LLC*, No. 11-5519, 2012 WL 2885935, at *7 (E.D. Pa. July 16, 2012) ("[E]xperience or tenure is oftentimes a poor proxy for quality.").  Even if Dingler is less experienced, the decision to hire him as an ECC operator is ultimately a business decision, and we are not in the position to "'sit as a super-personnel department [and] reexamine[] an entity's business decisions.'"  *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir. 1992).

Plaintiff also asserts that Defendant favored younger employees.  In support of this assertion, Plaintiff cites to the fact that Karl George, age 31, David Smolesnki Jr., age 44, and James Davis, age 53, were all hired in Defendant's engineering department in 2010 or 2011.

17

(Pl.'s Mot. 8.)  Of these three individuals, only Davis was hired as an ECC operator, and only one of these employees is outside of the protected class, i.e. under the age of 40.  Moreover, Plaintiff provides no evidence that he was similarly situated to any of these individuals.  There is no evidence indicating that Plaintiff was treated differently than these employees because of his age.

Moreover, it is well established that an employer's favorable treatment of other members of the protected class is relevant in determining whether the employer was motivated by discriminatory intent.  *See Reeves v. Sanderson Plumping Prods. Inc.*, 530 U.S. 133, 153 (2000) (finding the fact that employer had many managers over age 50 was relevant in determining whether employer acted with discriminatory animus); *Connecticut v. Teal*, 457 US. 440, 454 (1982) ("'Proof that [a] work force was racially balanced or that it contained a disproportionately high percentage of minority employees is not wholly irrelevant on the issue of intent when that issue is yet to be decided.'") (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 580 (1978)); *Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003) ("[E]mployer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent.").  Here, Plaintiff's brother, Angel Santiago, age 79, is still employed with Defendant.  (*See* Def.'s Mot. 11; Santiago Dep. 38, 63.)  In addition, eight of the ten employees hired by Defendant were over the age of 40.  (Def.'s Mot. 5.)  This favorable treatment of other members of the protected class, and in particular, Plaintiff's brother, who is even older than Plaintiff, creates an inference that Defendant lacked discriminatory animus when it chose not to hire Plaintiff.  Plaintiff's case is further weakened by the fact that Anastasi himself was 60 years old at the time he decided to not hire Plaintiff.  (Pl.'s Mot. 9); *see Elwell v. PP&L Inc.*, 47 F. App'x 183, 189 (3d Cir. 2002) (recognizing that the plaintiff's ability to raise an

inference of discrimination was weakened because the decision maker was a member of the protected class).

Plaintiff contends that the inconsistencies in Defendant's proffered reasons are evidence of pretext.  Plaintiff argues that Anastasi's testimony that Plaintiff did not submit an application nor appear for an interview, is inconsistent with his position that Plaintiff was considered for the position, but ultimately not chosen due to performance issues.  (Pl.'s Mot. 9.)  However, Anastasi did not testify, and Defendant does not argue that Plaintiff was not considered for the position. Anastasi simply stated that he never received the application from Plaintiff and never interviewed Plaintiff.  Even if Plaintiff did not submit an application or interview, he was still considered for the position.

Next, Plaintiff claims that Anastasi again contradicted himself by testifying that he did not consider Gougler's input, even though he specifically asked for his opinion.  (Pl.'s Mot. 9.)  There is nothing inconsistent about Anastasi requesting Gougler's opinion, but ultimately not considering that opinion when making the final hiring decisions.  Anastasi explained that Gougler's opinion did not factor in to his decision because by the time he spoke with Gougler he had already made his decision.  (Anastasi Dep. 31, 43.)

Plaintiff also points out that Defendant cites the information provided by Rich Finocchio about Plaintiff's job performance as one consideration in not selecting Plaintiff, but that Finocchio was not mentioned "once during any depositions."  (Pl.'s Mot. 10.)[24]  However, Finocchio's information about Plaintiff's job performance is cited as the reason in Defendant's answer to interrogatory number 6.  (Def.'s Answer to Interrog. No. 6, Def.'s Mot., Ex. A.) Anastasi's testimony is not necessarily inconsistent with Defendant's proffered reason.  While it

_____

[24] Finocchio is in fact mentioned in Francis Casey's testimony.  Casey states that Finocchio was one of the engineers who assisted Plaintiff with the fire alarm system.  (Casey Dep. 47-48.)

is true that Finocchio's name is absent from Anastasi's testimony, Anastasi was never asked if he consulted Finocchio in reaching his hiring decision, nor was he ever asked whether he consulted with anyone aside from Gougler and Casey.  Significantly, Anastasi's testimony regarding the information he received from Gougler and Casey with respect to Plaintiff's performance is consistent with the information relayed by Finocchio, that Plaintiff had fallen asleep while on duty, and had difficulty with the computer systems.  (*See* Def.'s Mot. 13 & Anastasi Dep. 44-45, 55.)

Plaintiff also takes issue with Defendant's characterization that Anastasi "observed" Plaintiff make an error at work.  (Pls.' Mot. 10.)  Plaintiff argues that Anastasi did not observe any mistake because he did not see Plaintiff commit the error, and could not describe with any detail what mistake was made.  (*Id.*)  Moreover, Anastasi was not told by anyone that Plaintiff committed the error, rather he only overheard that Plaintiff had done something wrong.  (*Id.*)  Plaintiff also argues that Anastasi's decision should have included a review of the employees' files and input from other employees.  (*Id.* at 11.)

The issue here is not whether Anastasi or Defendant conducted a comprehensive investigation or whether they made a wise or prudent decision.  The issue is whether their decision was motivated by discriminatory animus.  *See Hodczak v. Latrobe Specialty Steel Co.*, 761 F. Supp. 2d 261, 278 (W.D. Pa. 2010) (declining to find pretext where plaintiff argued defendant's investigation was lacking) (citing *Geddis v. Univ. of Del.*, 40 F. App'x, 650, 653 (3d Cir. 2002)); *Santichen*, 2008 WL 868212, *15 (employer had no obligation under ADEA to review personnel files or seek information beyond that provided by other employees); *see also Kariotis v. Navistar Int'l Trans. Corp.*, 131 F.3d 672, 677 (7th Cir. 1997) (holding that inadequate investigation was not sufficient to show employer's reasons were pretext).  Notwithstanding

20

Anastasi's alleged failure to adequately investigate the facts surrounding Plaintiff's purported error, there is no evidence to suggest that Anastasi's perception of this incident was not a motivating factor in his decision.  Plaintiff's supposed error was a reason given for Anastasi's decision, and "a reason honestly described but poorly founded is not a pretext as that term is used in the law of discrimination."  *Pollard v. Rea Magnet Wire Co., Inc*., 824 F.2d 557, 559 (7th Cir. 1987).

Finally, Plaintiff attempts to demonstrate pretext by arguing that if truly had such long-standing performance issues; he would have been terminated or demoted.  (Pl.'s Mot. 11.)  Again, pretext is not shown by demonstrating that the employer's decision was unwise or imprudent.  *See Fuentes,* 32 F.3d at 765.  It is up to the employer to determine what type of performance issues warrant a termination or demotion, and this Court is in no position to reexamine Defendant's business decisions.  *See Brewer*, 72 F.3d at 332; *see also Mercado v. Donahoe*, No. 11-2972, 2012 WL 2441148, *3 (3d Cir. June 28, 2012) ("[L]ack of notice or information about problems does not constitute evidence of pretext.").

We are compelled to conclude that Plaintiff has not pointed to any evidence discrediting Defendant's proffered reasons, nor has he presented any evidence demonstrating that age was the determinative but-for factor in Defendant's decision not to hire Plaintiff.  Plaintiff has failed to carry his burden on this issue.  Accordingly, the motion for summary judgment must be granted with respect to Defendant's claim of age discrimination.

**B.     Race Discrimination Under Title VII and the PHRA**

Under Title VII it is unlawful for an employer to discriminate against any individual "because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e–

21

2(a)(1).  A plaintiff alleging discrimination on the basis of race may proceed under the *McDonnell Douglas* burden shifting framework, and the aforementioned mixed-motive theory.[25]

> 1.   *McDonnell Douglas Analysis*

To establish a *prima facie* case of race discrimination under the *McDonnell Douglas* approach the plaintiff must show that:  (1) he is a member of a protected class; (2) he was qualified for the position he sought to attain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).  Plaintiff may satisfy the final element of his *prima facie* case by showing that similarly situated non-protected employees were treated more favorably.  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273 (3d Cir. 2010) (as an alternative to the fourth prong plaintiffs may show that similarly situated individuals outside the plaintiff's class were treated more favorably); *Vernon v. A&L Motors*, 381 F. App'x 164, 167 (3d Cir. 2010) (identification of more favorable treatment for similarly situated employee outside of the protected class may give rise to an inference of unlawful discrimination).  Once the defendant offers a legitimate non-discriminatory reason for the employment decision, the burden shifts back to the plaintiff to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate

---

[25] Several courts in this district have analyzed Title VII claims under both the *McDonnell Douglas* framework and the mixed-motive analysis. *See, e.g.*, *McCarty v. Marple Tp. Ambulance Corps.*, 869 F. Supp. 2d 638 (E.D. Pa. 2012); *Young v. St. James Mgmt.*, LLC, 749 F. Supp. 2d 281, 288 (E.D. Pa. 2010); *Hartwell v. Lifetime Doors, Inc.*, No. 05-2115, 2006 WL 381685, at *5 (E.D. Pa. Feb. 16, 2006); *Campetti v. Career Educ.Corp.*, No. 02-1349, 2003 WL 21961438, at *7 (E.D. Pa. June 25, 2003).  The Third Circuit has not definitively addressed the relationship between the mixed-motive analysis and the *McDonnell Douglas* framework.  In *Makky v. Chertoff* the court stated that "[t]he *McDonnell Douglas* burden-shifting framework does not apply in a mixed-motive case in the way it does in a pretext case because the issue in a mixed-motive case is not whether discrimination played the dispositive role but merely whether it played 'a motivating part' in an employment decision."  541 F.3d 205, 214 (3d Cir. 2008).  The court noted that the Supreme Court did not include a discussion of *McDonnell Douglas* in analyzing the requirements under the mixed-motive theory.  *Id.* at 214-15.

reasons; or (2) believe that in invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Defendant agrees that Plaintiff is Hispanic (Def.'s Mot. 2) and is therefore a member of a protected class. Plaintiff was qualified for the position, and suffered an adverse employment action when he was not selected for hire by Defendant. Plaintiff has presented evidence that as the only Hispanic, full-time ECC Operator, he was the only employee not selected for hire by Defendants, and that he was subsequently replaced by Dingler, a member of a non-protected class. (Pl.'s Mot. 7.) Plaintiff also argues that Defendant favored Caucasian employees by hiring Karl George, David Smolesnki Jr., and James Davis, in the engineering department in 2010 or 2011. (Pl.'s Mot. 8.) Plaintiff has offered no argument for why these individuals are similarly situated, but since "the plaintiff's burden at this first stage is not particularly onerous," *Doe v. C.A.R.S. Protection Plus, Inc*. 527 F.3d 358, 369 (3d Cir. 2008), we are satisfied that Plaintiff has established a *prima facie* case of discrimination.

As previously discussed, Defendant has articulated legitimate non-discriminatory reasons for not hiring Plaintiff—Defendant was unable to hire all of U.S. Facilities engineering employees due to costs of the contract, and Plaintiff was not selected for hire because the SSA Building Manager, Rich Finocchio, informed Anastasi that he had observed Plaintiff asleep on more than one occasion while on duty, and that he had not mastered the alarm system.

In order to demonstrate pretext, in addition to the evidence discussed with respect to Plaintiff's ADEA claim, Plaintiff argues that Francis Casey, a former co-worker, allegedly harbored prejudice against Hispanic individuals, and preferred to hire Caucasian workers over Hispanic applicants. (Pl.'s Mot. 12.) Plaintiff suggests, without offering any support for his argument, that this Court should consider Casey a decision-maker. (*Id*.) Evan though Plaintiff did

not present this case under the "cat's paw" theory, also referred to as "subordinate bias liability," given Plaintiff's characterization of Casey as a decision-maker we will include a discussion of "cat's paw" liability.

Under the subordinate bias theory of liability, the plaintiff seeks to hold his employer liable for the animus of a non-decision-maker. *Marcus v. PQ Corp*., 458 F. App'x 207, 211 n.3 (3d Cir. 2012). In the recent Supreme Court opinion, *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1189 (2011), the plaintiff alleged that he was terminated from employment with the defendant in violation of the Uniform Services Employment and Reemployment Rights Act (USERA) because his two supervisors were hostile to his obligations that accompanied his membership in the United States Army Reserve. *Id*. at 1189. The record showed that the plaintiff was subject to frequent anti-military remarks and that his supervisors often expressed a desire to "get rid of him." *Id.* The plaintiff's supervisors issued an unwarranted "Corrective Action," a type of disciplinary warning, against the plaintiff based on an alleged violation of a company rule, and then subsequently lied to management that the plaintiff had violated the terms of the Corrective Action. *Id.* The plaintiff was fired in reliance on the supervisors' allegations. *Id.* The Court held that "if a supervisor performs an act motivated by antimilitary animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, the employer is liable under the [Uniform Services Employment and Reemployment Rights Act]." *Id.* at 1194. (emphasis in original)

The Third Circuit later held that the underlying agency principles set forth in *Staub* "apply equally to all types of employment discrimination." *Marcus*, 458 F. App'x at 212. The Third Circuit noted that *Staub* was consistent with previous Third Circuit precedent allowing plaintiffs to pursue employment discrimination claims under a cat's paw theory. *Id.* at 211 (citing

24

*Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 285-86 (3d Cir. 2001) (citing *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1214 (3d Cir. 1995) ("Under our case law, it is sufficient if those exhibiting discriminatory animus influenced or participated in the decision to terminate.")).

Here, by arguing that Casey should be considered a "decision-maker," Plaintiff essentially seeks to use the "cat's paw" theory to hold Defendant liable for Casey's alleged animus.  Plaintiff argues that Casey preferred to hire non-Hispanic employees. In support of this assertion, Plaintiff cites the testimony of Zach Jones.  Jones stated that Casey questioned his decision to hire Hispanic employees, in particular Orlando Rivera.  Jones stated that Casey wanted to hire someone he had recommended to Jones, a Caucasian individual.  Based on Casey's preference, Jones assumed that Casey was displeased with the hiring of Rivera because he was Hispanic. However, there is no indication from Jones's testimony that race had any part in Casey's dissatisfaction with Rivera.  In fact, when Jones was asked if Casey ever expressed a preference for Hispanic employees over Caucasian employees, Jones responded "Mr. Casey had a preference for me to hire someone who was, like I said, either he was friendly with or related to, and because I didn't, he was a little displeased."  It appears from Jones's testimony that Casey had a preference for family and friends, but had not expressed a preference for non-Hispanic individuals.

Jones also testified that he heard Casey make derogatory jokes about Hispanics, and refer to Hispanic individuals as "spics."  The Third Circuit has held that "[s]tray remarks by non-decision makers or by decision makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992).  To differentiate between a comment that is probative of discriminatory intent or a "stray" remark courts have outlined

25

several factors:  "(1) who made the remark, i.e., a decision-maker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decision-making process."  *Hodczak*, 761 F. Supp. 2d at 280 (citations omitted).

While there is no question that Casey's statements would be viewed as discriminatory by a reasonable jury, we conclude that the alleged comments were stray remarks.  Casey was not Plaintiff's supervisor at the time the remarks were allegedly made.  Jones testified that he never heard Casey direct a discriminatory remark or joke to or specifically about Plaintiff, and the comments were not made in the context of any hiring decisions.

Contrary to the evidence submitted in *Staub*, Anastasi did not rely on Casey's opinion when making the ultimate hiring decisions.  Anastasi was responsible for all of the hiring decisions, and he testified that he based his decision in large part on interviews, and observing Plaintiff's performance.  He also testified that Casey's input about his fellow employees played a marginal role in his hiring decisions, stating that it merely solidified his decision "a little bit."  Moreover, Casey never made a racist remark or joke to Anastasi.

Plaintiff also argued that the Defendant favored Caucasian employees in the engineering department by hiring Karl George, David Smolesnki Jr., and James Davis.  However, we note that after Dingler left his position as an ECC Operator, he was eventually replaced by a fifty-one year old Hispanic individual, Orlando Rivera.  Moreover, Defendant continues to employ Angel Santiago, Plaintiff's seventy-nine year old brother.  *See Ansell*, 347 F.3d at 524 ("[E]mployer's favorable treatment of other members of a protected class can create an inference that the employer lacks discriminatory intent.").  Plaintiff's replacement by Rivera, in addition to the

26

continued employment of Plaintiff's brother, demonstrates that Defendant lacks the requisite discriminatory intent.

Viewing the record as a whole, in a light most favorable to Plaintiff, we conclude that a reasonable jury could not find that an unlawful discriminatory purpose was more likely than not the motivating or determinative cause of Defendant's action.

        2.      *Mixed-Motive Analysis*

A plaintiff proceeding under the mixed-motive theory may prevail on summary judgment if he or she can "present sufficient evidence for a reasonably jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'"  *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003) (quoting 42 U.S.C. § 2000e-2(m)).  Again, we conclude that Plaintiff has failed to meet his burden under this standard.  For the reasons set forth above, Plaintiff has offered insufficient evidence that race was a motivating factor in Defendant's decision not to hire him.[26]

---

[26] Analysis under the mixed-motive doctrine would be redundant in this case.  Under the mixed-motive theory, Plaintiff must present evidence that race was a motivating factor.  Similarly, under *McDonnel Douglas*, a plaintiff may show pretext if discrimination was more likely than not a motivating or determinative cause of the employer's action.  *See Hartwell*, 2006 WL 381685, at *5 n.6 ("[T]he language in *Desert Palace* describing the plaintiff's burden in mixed-motive cases . . . is similar to the language used by *Fuentes* . . . describing the second manner in which a plaintiff can show pretext (discrimination "was more likely than not a motivating or determinative cause of the employer's action")).  Under the *McDonnell-Douglas* framework, we have considered whether race was a determinative or motivating cause of the decision not to hire Plaintiff, and therefore, for the same reasons that we concluded that Plaintiff failed to meet his burden under *McDonnell Douglas*, we find that a reasonable jury, under the mixed-motive theory, could not find that an invidious discriminatory purpose motivated Defendant's decision.

IV.     **CONCLUSION**

 For the foregoing reasons, Defendant's Motion for Summary Judgment will be granted.

An appropriate Order follows.

**BY THE COURT:**

_____

**R. BARCLAY SURRICK, J.**